IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PETER BRUSAMONTI, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 20-652 |
| ) | |
| v. ) | Judge Cathy Bissoon |
| ) | |
| XTO ENERGY INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

**I. MEMORANDUM**

Defendant's renewed Motion for summary judgment (Doc. 96) will be granted. Since the Court of Appeals for the Third Circuit remanded this case for further proceedings, there have been two meaningful developments.

First, Defendant has paid Plaintiffs the $2.57 they claimed was owing. Doc. 96-1 at ¶ 10. Second, it has submitted a sworn declaration from project advisor Holly Green stating, based on personal knowledge and her review of Defendant's business and accounting records, it correctly adjusted its revenue accounting records and already had fully reimbursed costs improperly deducted. *Id.* at ¶ 9. Ms. Green is no stranger to the case, her sworn statements were considered in the Motion for summary judgment leading to the appeal.

Ms. Green now has provided cogent explanations for why a review of the "owner deductions" column of Plaintiffs' royalty checks would not reflect – down to the penny – the exact amounts of costs withheld and reimbursed. *Id.* at ¶¶ 7-8 (heretofore-uncaptured variables included whether figures were recorded to the second, fourth or eighth decimal place, and the fact that royalties were rounded to the second decimal place, i.e., the nearest penny;

and the amounts reflected on Plaintiffs' check stubs also reflected "prior period adjustments," which can occur for many different reasons).

To be fair to Plaintiffs, Ms. Green's statements – before the appeal – did not go into such a granular level of detail. To be fair to Defendant, it was hardly certain that Plaintiffs would pin their appeal on a $2.57 discrepancy. Plaintiffs did so, and the Circuit Court agreed with them. Doc. 92-2 at 2, 6 ("[b]y August 2020," Defendant "had reimbursed [Plaintiffs] for all but $2.57 of the payments wrongfully withheld," and "[t]he spreadsheet of data that underlies the simple arithmetic performed by Plaintiffs' counsel to arrive at the remaining $2.57 in dispute was provided by [Defendant]").

After three years and five months of prior trial court proceedings – including the filing of thirteen status reports, spanning thirteen months of informational exchanges (Docs. 29, 31, 34, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54 & 56); a video-recorded meet and confer session, reviewed by the Court in its entirety; and the scheduling and filing of two summary judgment Motions – the parameters of the remaining disputes are narrow and well-defined: (a) the $2.57 addressed on appeal (since paid); and (b) Plaintiffs' shifting-sands demand for "pre-judgment interest." *Compare* Compl. (Doc. 1) at ¶¶ 43, 44, 52 (referencing "interest," and "pre-judgment interest," unspecified) *with* Doc. 65 at ¶ 5 (joint status report dated Nov. 8, 2022, signed by counsel for Plaintiffs, stating: "Plaintiffs' position is" that they "are still owed interest at a rate of 8% per annum[,] . . . "pursuant to [their] leasing agreement with Defendant") (emphasis added) *and* Agreement (Doc. 1-1) (once referencing "interest at the rate of eight (8%) percent per annum," in ¶ 16, which governed "a shut-in [gas well] royalty equal to $1.00 per acre"—circumstances having nothing to do with this lawsuit) (emphasis added); *and then see* Doc. 70 at 10-11 & n.5 (asserting, for the first time in January 2023, that Plaintiffs are owed 6% interest, because,

"[w]here no specific interest rate is set by contract, Pennsylvania law sets the interest rate at 6%.") (citing 41 Pa. Stat. Ann. § 202).

In response to the sworn statements of Ms. Green, Plaintiffs offer . . . nothing. Instead, counsel rehash the same tired positions leading to the Court's "distinct impression that this matter ha[d] degenerated into one where attorney['s] fees [we]re in search of a claim." Doc. 87 at 2. The Circuit Court reversed and remanded on summary judgment, leading to these additional proceedings. Nothing in the Opinion, however, disabused the Court's prior impression, nor have Plaintiffs' latest filings. If anything, their current positions serve only to emphasize the conclusion.

Defendant has presented competent evidence demonstrating the absence of a genuine issue of material fact. U.S. v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011). Namely, that $2.57 was not – in fact – owing. Plaintiffs were required to "come forward with specific facts showing" the contrary, not just "that there is some metaphysical doubt." *Id.* (citation to quoted sources omitted). They have not done so.

Similarly, Plaintiffs' contention that interest was owing under the contract – first, pursuant to an inapplicable section regarding "shut-in" well royalties, then later under Pennsylvania's generic statutory rate – is belied by the express terms of the agreement. As Defendant has highlighted, its payment obligations were "subject to adjustments necessary to reconcile and correct the cumulative payments made to [Plaintiffs]." Doc. 1-1 at ¶ 2(c). Given the agreement's specificity in shut-in well section, its silence regarding interest on regular royalties is telling.[1] *Compare* Def.'s Br. (Doc. 98) at 4 (arguing that the agreement is clear,

---

[1] At the risk of digressing on a provision that simply does not apply, paragraph 16's 8% interest assessment applied to Defendant's "failure to timely or correctly pay or tender the shut-in royalty for any year." Doc. 1-1 at ¶ 16 (emphasis added). Defendant's evidence, cited by Plaintiffs in

3

and it does not support Plaintiffs' current interest demand) *with* Pls.' Opp'n papers (Docs. 99 & 100) (failing to address the contract provision relied on by Defendant, let alone argue for an alternative meaning) *and* discussions *supra* (Plaintiffs relied on the 8% interest rate in November 2022, and only settled on its 6% theory in January 2023, over three-and-a-half years after filing suit); *see* Pennbarr Corp. v. Ins. Co. of N. Amer., 976 F.2d 145, 149-50 (3d Cir. 1992) (whether ambiguity exists is a question of law, and only "[i]f the non-moving party presents" a "reasonable [alternative] reading of the contract" is there "a question of fact" precluding summary judgment) (citation to quoted and other sources omitted) *cf. also* Adams v. Alcorn, 2015 WL 1524481, *6 (W.D. Va. Apr. 2, 2015) (by analogy to the doctrine of *expressio unius est exclusio alterius*, the inclusion of a term in one section of a contract and exclusion in another is "attributed to a deliberate choice"); Zurn Indus., LLC v. Allstate Ins. Co., 2024 WL 1348815, *4 (W.D. Pa. Mar. 29, 2024) (applying the referenced rule of construction under Pennsylvania law).[2]

Having concluded that Defendant is entitled to summary judgment, Plaintiffs' repetitious demand for class treatment fails—for multiple reasons. The Court denied their Motion for class discovery, and later struck the Motion (Doc. 72) for class certification, as inconsistent with the

---

opposition to summary judgment, reveals that it began reimbursing Plaintiffs *the same year* it improperly deducted production costs (and less than 12 months after the first improper deduction). Doc. 99 at 2-3 & n.2.

[2] Generally speaking, rules of construction are considered to resolve a claimed ambiguity. *See generally* Talley v. Wetzel, 15 F.4th 275, 284 (3d Cir. 2021). The relevant provisions in the agreement are unambiguous. To the extent one may argue ambiguity (and Plaintiffs have not), the *expressio unius* canon confirms that, had the parties intended there to be interest on regular royalties, they knew how to provide for it. *See id.* (reaching analogous conclusion). In any event, summary judgment is appropriate because Plaintiffs have failed to engage the issue, let alone proffer a contrary reading. *See* Pennbarr. As already noted, they were pitching a different interest-theory only two months prior to opposing summary judgment, with a different source of obligation and a different interest rate.

case management plan. *See* text-Order at Doc. 79; Mem. & Order (Doc. 87) at 3, n.2 & n.3 (invoking the Court's inherent authority to control its docket). The case management plan was informed by a number of factors, including: the Court's discussions with counsel, and review of their video meet-and-confer session, through which it became clear that Plaintiffs' counsel "remain[ed] unprepared to identify, even on information and belief, other property owners who were similarly affected"; to avoid "protracted [legal] wrangling" over Defendant's associated Motion (Doc. 81) for sanctions, which was "not-insubstantial"; the Court's "serious doubts as to whether class treatment is warranted or feasible," in light of the entry summary judgment and Plaintiffs' inability to present "any presum[ably affected] but not-yet-identified property owner"; and the lack of prejudice to other property-holders, should they come forward later, because the Court declined to adjudicate the class allegations on their merits. Doc. 87.

The Circuit Court's assignments of error have been accounted for, and the striking of Plaintiffs' Motion for class certification remains appropriate. Plaintiffs' class allegations were pleaded on "information and belief":

> Plaintiffs have inquired to Defendant about the royalty deductions since January of 2019 and requested that they be paid back royalties owed to them; however, <u>Defendant has yet to cure the issue or reimburse Plaintiffs</u> for the wrongfully deducted post-production costs incurred each month. <u>Based upon information and belief, Defendant also has yet to cure the same issues or reimburse class members for their wrongfully deducted post-production costs incurred each month</u>.

Doc. 1 at ¶ 23 (emphasis added).

Plaintiffs' assertion that Defendant had yet to "reimburse Plaintiffs for the wrongfully deducted post-production costs," it turns out, was not unconditionally accurate (reimbursement began in October 2019, before the lawsuit was filed). Placing that to one side, their averment,

"on information and belief," that others were similarly affected *arguably* was supported by *some* "data to justify interposing an allegation on the subject." U.S. v. One Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber, Ser. No. LW001804, 115 F. Supp. 3d 544, 576 (E.D. Pa. 2015) (quoting 5 Wright, Miller & Kane, Federal Practice & Procedure § 1224 (4th ed. 2025)).  Namely, Plaintiffs' reference to Defendant's letter to lessors, in January 2019, advising that "it had upgraded its revenue calculation and check writing system," and "there could be issues" resulting from the transfer of information from the old system to the new one.  Doc. 1 at ¶ 18.

As Defendant has highlighted, the letter did not indicate that there "could be issues"— of the type the Brusamontis complained of, at least.  Doc. 1-3 ("the system upgrade may cause a delay in revenue [recordation and payment]," and, if a delay resulted, Defendant would use the prior month's production measurements and reconcile any differences "as quickly as possible" thereafter).  All the letter did was place Plaintiffs on notice that a technological adjustment *may* have had something to do with their erroneous subjection to production costs.

Through the course of discussions before the Court, and during the recorded meet and confer session, Defendant's counsel repeatedly advised Plaintiffs' counsel that its contracts with various property-holder lessors were *individualized*; and that the computer upgrade did not (and could not) result in a systemic assessment of unwarranted post-production costs.  This was impossible, given that *a number of lease agreements specifically demanded the assessment of post-production charges*.  Although discussions before the Court were not recorded by a court reporter, defense counsel remained ethically bound by their duty of candor, and neither the undersigned nor Plaintiffs' counsel had reason to doubt, nor did they doubt, defense counsel's good-faith representations.

The parties' status reports regarding their meet and confer process (leading up to the recorded session) revealed that Plaintiffs provided information regarding "certain individuals other than [them]" for Defendant to investigate, to make sure they were not affected. Doc. 38 at ⁋⁋ 2-3; Doc. 40 at ⁋⁋ 2-3 (noting that Defendant's investigation "remain[ed] ongoing, in part because of the number of different individuals identified by Plaintiffs, the number of lease instruments and records [*Plaintiffs*] provided[,] and the fact that payment records [we]re contained in multiple different software systems"); Doc. 42 (Defendant would provide documentation and summaries regarding the individuals identified by Plaintiffs); Doc. 44 (Defendant communicated the results of their investigations, but Plaintiffs wanted a 30(b)(6) deposition and informal written discovery productions); *and* Doc. 56 (despite the deposition and substantial productions, Plaintiff remained dissatisfied and requested a lifting of the stay).

These efforts culminated in a Court Conference, at which time counsel presented overarching statements of the parties' positions. Docs. 61 & 62. It was at this point that Plaintiffs admitted they had been fully reimbursed; and, based on the parties' representations as to the information uncovered, the Court expressly cautioned that "due consideration [must be] given to the lawyers' responsibilities and obligations under both the rules of ethics and the Federal Rules of Civil Procedure." Text-Order at Doc. 62. The parties were ordered to conduct a recorded meet and confer session, "regarding how and whether this case should proceed." *Id.*

They did, and the Court reviewed the session, in its entirety. That the Court held in abeyance the previously-ordered class discovery, and directed Defendant to file "an appropriate dispositive motion," Doc. 66, speaks volumes.

Oftentimes, litigation disputes reach a point where there really is nothing more that can be said. For example, one side requests audio or video recordings of an incident they believe

7

was recorded. The other side represents, under a duty of candor with the court, that none exist. If the requesting side presses further, the only possible response is, counsel cannot produce what they do not have.

None of the potential comparators identified by Plaintiffs "panned out" – they have not asserted or suggested otherwise. Instead, they interpreted defense counsel's assertion of privilege during the 30(b)(6) deposition as proof that Defendant's investigations uncovered affected property-holders they refuse to identify. Defendant repeatedly has advised Plaintiffs' counsel, no such evidence has been uncovered. *See* Doc. 82 at 5. Like a party demanding the production of recordings the other side does not have, the other side's statement to that effect is – in the Plaintiffs' eyes – inconclusive. (Such a position, of course, is necessary to keep the flames of litigation alive.)

By the time of the video-recorded meet and confer session, grounds for pleading on "information and belief" – if they ever existed – had expired. Plaintiffs' ability to identify other potentially affected property-holders (the status reports indicated, nine of them) – along with both sides to the contracts having access to the written agreements (*Plaintiffs gave copies to defense counsel*) – belie any suggestion that "the facts [we]re peculiarly within the possession and control of [D]efendant." Wright & Miller § 1224 at n.4 & n.10 (information and belief allegations are more appropriate, but still must be plausible, when the plaintiff lacks access to information held by the defendant). Liberal presumptions and relaxed standards at the pleadings stage do not carry on ad infinitum. Fed. R. Civ. P. 11(b) (the obligations of pleadings signatories extend to "later advocating" their contents). Eventually, the "bill" – on Rule 11's demand for "factual contentions hav[ing] evidentiary support" – comes due. *Id.*, 11(b)(3); *see* Abney v. Basial, 2019 WL 7812384, *2 (M.D. Pa. Oct. 8, 2019) ("a properly documented [dispositive]

motion" compels parties making allegations to support them "by more than information and belief," they "must present facts, rather than suspicions").

The Court believed earlier, and it still does, that Plaintiffs' perpetuation of their demands – after Defendant had made every reasonable effort to show there was no "there, there" – brushed, if not crossed, the Rule 11 line. This was strongly insinuated, but the Court stopped short of a judicial finding, in the hope that Plaintiffs' counsel would not be forced to defend Rule 11 proceedings. *See* discussions *supra* (highlighting Court Orders warning of the need for compliance with "the rules of ethics and the Federal Rules," and characterizing Defendant's Motion for Sanctions as "not-insubstantial").

Plaintiffs' counsel put Defendant to the task of investigating no fewer than nine additional property-holders, and none of them "panned out." Their clients are not under a gag order, and have remained free to discuss their allegations with friends, neighbors – whomever they wish. As of present, counsel and their clients have offered *no* support for the contention that other property-holders were affected. There certainly is no indication that a widespread or systematic problem resulted from Defendant's technology update. Plaintiffs' counsel have "spun" defense counsel's clear representations that no evidence has been uncovered. They have done so to prop-up their claimed entitlement to (additional) class discovery, so they can go fishing for an actionable claim. The Court's cautions notwithstanding, Plaintiff have (and will) persist. Their chosen litigation position demands unfettered access to everything in the lake. "[T]o allow for discovery . . . would be [to] permit" the "expedition" to continue, until they hook into something, anything, to perpetuate the litigation. *See* Ranke v. Sanofi-Synthelabo Inc., 436 F.3d 197, 204 (3d Cir. 2006); Doc. 87 at n.4 (collecting cases on class certification, prohibiting the same kind of expedition sought here).

It is well past time to reel in the lines, and return to shore. The expedition should, and must, eventually end.

The findings above, independently and in conjunction with the grant of summary judgment, support the Court's striking of Plaintiffs' Motion for class certification. In the alternative, it is deniable as moot. Harrow v. Prudential Ins. Co. of Amer., 279 F.3d 244, 247 n.5, 255 (3d Cir. 2002) (affirming, where summary judgment was granted and the plaintiff's "motion for class certification was not heard in light of the grant"); T.R. v. Sch. Dist. of Phila., 4 F.4th 179, 191 (3d Cir. 2021) (grant of summary judgment eliminated the "need [to] address the class certification issues," because "Rule 23 is a procedural device that cannot be interpreted to abridge, enlarge or modify any substantive right") (citation to quoted sources omitted); Wharton v. Danberg, 854 F.3d 234, 247 (3d Cir. 2017) (same); Hennessy v. F.D.I.C., 58 F.3d 908, 924 (3d Cir. 1995) ("[b]ecause of our decision" that the plaintiffs' "claims cannot survive summary judgment, we need not address the propriety of the district court's [ruling on] class certification").[3]

In light of Plaintiffs' continued advancement of deficient allegations "on information and belief," the Court is disinclined to dignify the merits of their certification demand. Even were the Court to entertain them, Plaintiffs' class definition is so broad that it cannot meaningfully be analyzed. The proposed class definition has no temporal limits, and the specific class definition

---

[3] The following unpublished decisions are persuasive authority, offered by way of illustration only: Brogan v. Fred Beans Chevrolet, Inc., 855 Fed. Appx. 825, 826, 828 (3d Cir. Apr. 19, 2021) (affirming the district court's grant of summary judgment and denial of the plaintiff's class-certification motion as moot; "The law does not punish [the defendant] for [an ultimately] harmless blip in its financing process."); DiCuio v. Brother Int'l Corp., 653 Fed. Appx. 109, 110-11 (3d Cir. Jun. 29, 2016) (affirming grant of summary judgment and the decision "not [to] reach class certification"); Ross v. Metro. Life Ins. Co., 297 Fed. Appx. 187, 189 (3d Cir. Oct. 28, 2008) (same).

does not even require an improper assessment of production costs. Compl. (Doc. 1) at ⁋ 25; Pls.' stricken Mot. (Doc. 73) at 5 (same definition). Although the Court may attempt to inject Plaintiffs' general allegations into the definition, there are a number of forks in road that would require careful consideration and advocacy, and the undersigned will not do Plaintiffs' work for them.[4]

Nor do the pleadings identify the subcategory in 23(b) to be certified, although Plaintiffs' motion papers seem understand—23(b)(3) is the one. In re: Google Inc. Cookie Placement Consumer Priv. Litig, 934 F.3d 316, 322 (3d Cir. 2019) (Rule 23(b)(3) is "primarily used to pursue money-damages").

*None* of the class requirements can be assessed under the proposed class definition. Numerosity is uncertain, because of the lack of temporal limits. The definition, moreover, does not answer whether class members include present lessors, lessors at the time the Complaint, or both. As Defendant has highlighted, moreover, determining the number of class members in a well-defined class would require an individualized review of "thousands" of contracts (according to the Complaint). Doc. 1 at ⁋ 27.

Commonality and typicality are lacking because the definition does not exclude lessors who suffered no improper deductions, let alone answer whether membership is restricted to those who allegedly were harmed by the computer update. And given Plaintiffs' lack of evidence that

---

[4] To name but a few: The class definition does not restrict itself to lessors owing no contribution to post-production costs. Do any of the lease agreements permit or exclude pre-production costs? Is the class limited to lessors allegedly impacted by the computer update? If not, how might common questions predominate? Does the class include lessors who received partial reimbursement? Full reimbursement? For reimbursement provided, how long was too long for Defendant's remediation?

11

*any* other lessor suffered improper deductions, through any means, they are typical – and adequate representatives – of only themselves.

Between the unworkable class definition and the insufficiency of "information" to support their "beliefs," they satisfy none of the 23(b)(3) requirements either (predomination, superiority or manageability). Ascertainability cannot be assessed until a class *appropriately* is defined; with temporal parameters; and answers are provided regarding the handling of former lessors who suffered improper deductions but sold their property before reimbursement, with or without a reservation of oil and mineral rights.

Like pleadings under the Federal Rules, a request for class certification requires more than Plaintiffs' claim that a class exists, and their counsel want to represent it. *Cf.* Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). If Plaintiffs have shown more, the undersigned isn't seeing it.

For all of the reasons stated above, the Court hereby enters the following:

## II. ORDER

Defendant's renewed Motion for Summary Judgment (Doc. 96) is **GRANTED**.

IT IS SO ORDERED.


September 30, 2025                                        s/Cathy Bissoon
                                                          Cathy Bissoon
                                                          United States District Judge


cc (via ECF email notification):

All Counsel of Record